On Application for Rehearing

THOMPSON, Presiding Judge.
The opinion of February 15, 2013, is withdrawn, and the following is substituted therefor.
M.D.P. (“the child”) is the child of G.W.P. III (“the father”) and N.B. (“the mother”). It does not appear that the child spent any significant time in the custody of his parents following his birth in' August 2008. In February 2009, in response to a petition filed by K.F.P. (“the paternal grandmother”), the Walker Juvenile Court (“the juvenile court”) found the child dependent and awarded custody of him to the paternal grandmother.
On April 13, 2011, R.A.P. (“the great-uncle”) and R.J.P. (“the great-aunt”) filed a petition in the juvenile court seeking an award of custody of the child. In their petition, the great-aunt and the great-uncle alleged that the child was dependent and that a material change in circumstances had occurred warranting a modification of custody. The juvenile court awarded the great-aunt and the great-uncle pendente lite custody of the child.
In June 2011, in response to a motion filed by the paternal grandmother, the juvenile court entered an order setting aside the pendente lite order awarding the great-aunt and the great-uncle custody of the child. However, in that June 2011 order, the juvenile court ordered that the great-aunt and the great-uncle receive visitation with the child on alternating weeks; thus, the effect of the June 2011 order was to award the paternal grandmother and the great-aunt and the great-uncle alternating weekly custodial periods with the child. We note that neither the father nor the mother sought an award of custody of the child.
After conducting an ore tenus hearing, the juvenile court entered a judgment on March 27, 2012, in which it found the child dependent and modified custody of the child. The juvenile court ordered that the parties share joint legal custody of the child, and it awarded primary physical custody to the great-aunt and the great-uncle. The juvenile court awarded the father alternating weekend visitation with the child, *1036 and it specified that that visitation was to be “directly supervised” by the paternal grandmother. The paternal grandmother filed a postjudgment motion, and that motion was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. The paternal grandmother timely appealed.
The record indicates that the mother and the father were living with the great-aunt and the great-uncle at the time the child was born. According to the great-aunt, following the birth of the child, the parents and the child returned to the great-aunt and the great-uncle’s home. Shortly thereafter, however, the child, and perhaps one or both of the parents, began residing with the paternal grandmother.
The great-aunt testified that, shortly after the child’s birth, the paternal grandmother had left the child with the great-aunt and the great-uncle for two to three days each week. The great-aunt testified that she and the great-uncle kept the child to help the paternal grandmother. The great-aunt stated that the paternal grandmother would become stressed and yell at the child or in the child’s presence. The great-uncle testified that he had heard telephone conversations between the great-aunt and the paternal grandmother in which the paternal grandmother would be “cursing and hollering” at or about the child and stating that the child’s crying was “driving her crazy.” At the ore tenus hearing, both the great-aunt and the great-uncle testified that they were concerned about that conduct.
The great-uncle also testified that the child had stayed with him and the great-aunt for two to three days a week for the first two years of the child’s life. The great-uncle stated that the child stayed in their home whenever he or the great-aunt had a day off from work.
The great-aunt and the great-uncle each testified that, in June 2010, the parents had a daughter and that, shortly thereafter, the child began living with them on a full-time basis. They also explained that the paternal grandmother’s boyfriend, who was living in her home, was very ill at that time. The great-aunt and the great-uncle presented the testimony of one of their friends who babysits the child while they are working; that friend testified that the child had lived full time in the great-aunt and the great-uncle’s home since June or July 2010. ■
The paternal grandmother admits that the great-aunt and the great-uncle had initially kept the child for two nights each week, mainly on the weekends, because the child did not sleep well and she needed a break. However, she disputes that she allowed the child to begin living with the great-aunt and the great-uncle in the summer of 2010. The paternal grandmother testified that she had taken the child to the doctor several times during the time that the great-aunt and the great-uncle claimed that the child was living full time with them. On cross-examination, the attorney for the great-aunt and the great-uncle asked the paternal grandmother whether, at the times she claimed to have taken the child to the doctor, the great-aunt had had the child and had picked up the paternal grandmother to accompany them to the appointments. In response, the maternal grandmother stated, “not every time.”
According to the paternal grandmother, the child began living full time with the great-aunt and the great-uncle in November 2010, when the paternal grandmother had surgery. The paternal grandmother stated that, in December 2010, her boyfriend died and that, as a result, the child remained with the great-aunt and the great-uncle at that time. The father also testified that the child had not gone to live with the great-aunt and the great-uncle until November 2010, but he also stated *1037 that the great-aunt and the great-uncle had kept the child often in September and October 2010, when the paternal grandmother had medical tests performed. The paternal grandmother also presented the testimony of her mail carrier and her neighbor, each of whom believed that the child had been living with the paternal grandmother.
The paternal grandmother stated that, after December 2010, she had begun requesting that the child be returned to her. She stated that the great-aunt responded by stating that the child was doing well with the great-aunt and the great-uncle. The father testified that he was arrested on outstanding warrants in January 2011 and incarcerated for three months. When the father was released from jail in early April 2011, he demanded that the child be returned to the custody of the paternal grandmother. It is undisputed that the child returned to the paternal grandmother’s home for approximately a week and that he then returned to the great-aunt and the great-uncle’s home; the details of those transfers, while in dispute, are not relevant to the disposition of this appeal. On April 13, 2011, the great-aunt and the great-uncle filed their petition for custody of the child.
It is undisputed that both the home of the paternal grandmother and the home of the great-aunt and the great-uncle are adequate for the child. The paternal grandmother admitted that she had no concerns about the child’s safety or welfare when he was with the great-aunt and the great-uncle, although she thought the child should live with her because she is his grandmother.
The great-aunt testified that she was concerned that the paternal grandmother has “bad nerves” and that raising the child is too much for her. The great-aunt and the great-uncle also expressed concern about the paternal grandmother’s allowing the parents unsupervised contact with the child.
The record contains references by the witnesses, including various family members, to a pattern of drug use by the parents. The family members agreed that the child should not be in the presence of either parent unless that parent was not under the influence of an intoxicating substance. The father testified that the paternal grandmother had not placed any restrictions on his visitation with the child and that he often visited the child at the paternal grandmother’s home. The father stated that he and the mother had left the paternal grandmother’s home accompanied by the child a couple of times.
The great-aunt and the great-uncle presented evidence indicating that the paternal grandmother has allowed the parents to have unsupervised visitation with the child. M.L.P., the child’s paternal great-grandmother, testified as a hostile witness that she had observed the mother and the father alone with the child in the paternal grandmother’s home on multiple occasions; the most recent of those occasions was in January 2012. M.L.P. also testified that she had seen the parents and the child alone in a vehicle and at a store on at least two separate occasions. The paternal grandmother testified that she believed that she was with the parents and the child on at least one of those occasions but that M.L.P. did not see her. The paternal grandmother testified that she had not observed the parents acting as if they were intoxicated when they were around the child, and she stated that she would not leave the child with the parents if she believed that they were using drugs.
The record indicates that both parents have criminal records. The father has been convicted of several property crimes, and he was released from incarceration in *1038 2003 after serving five years in prison for those convictions. The father admitted that he had been charged with manufacturing methamphetamine three years before the hearing in this case, but he denied that he was guilty of those charges. The father stated that, as of the time of the hearing in this matter, there had been no trial related to those charges.
The juvenile court ordered the parties and the parents to submit to drug tests on the date of the hearing in this matter. The results of those tests for the parties were negative. The father’s test result was positive for the use of methamphetamine. At the hearing, the father denied that he had used illegal methamphetamine, and he stated that he had taken an over-the-counter medication. However, the record indicates that the father failed to inform the testing facility of his assertion that he had taken that over-the-counter medication.[1] We note that the mother did not return to the hearing after the break during which the parties submitted to drug testing. The father testified that the mother became upset because she did not have the money to pay for the test and that she went home rather than return to attend the hearing.
On appeal, the paternal grandmother argues that the juvenile court erred in modifying custody of the child.[2] In its March 27, 2012, judgment, the juvenile court applied the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984), in modifying custody. Specifically, the juvenile court found
“that sufficient evidence was presented to show that the positive good to the child ... brought about by a custody modification in this cause will more that offset the inherently disruptive effect caused by uprooting the child[,].... [t]hat [the great-uncle and the great-aunt] are fit and proper custodians of said child and that an award of custody to the great-aunt and the great-uncle would ‘materially promote[] the child’s best interest and welfare.’ ”
See Ex parte McLendon, 455 So.2d at 865-66.
We note that the great-aunt and the great-uncle contend that, because the juvenile court found the child to be dependent, the “best interests of the child” standard should be applied. After a careful review of the record, we disagree. Although the juvenile court found that the child remained dependent, that finding seems to be based upon the parents’ continued failure to serve as appropriate parents for the child. The dispute in this case was over which relative or relatives should raise the child. Given the evidence and the nature of the parties’ arguments below, we conclude that, although the juvenile court found the child dependent, this action is more in the nature of a custody dispute. See S.D.F. v. A.K., 875 So.2d 326 (Ala.Civ.App.2003). In Ex parte J.P., 641 So.2d 276, 278-79 (Ala.1994), our supreme court held that the McLendon standard applies in a custody-modification action between nonparents. In this case, the juve *1039 nile court correctly applied the McLendon standard in reaching its judgment.[3]
The paternal grandmother argues that the evidence does not support the juvenile court’s custody modification under the McLendon standard. The record indicates that the paternal grandmother has relied heavily on the great-aunt and the great-uncle to help her with the child since the child’s birth. The parties presented conflicting evidence regarding when the paternal grandmother allowed the child to live full time with the great-aunt and the great-uncle. The evidence would support a conclusion that the paternal grandmother left the child in the home of the great-aunt and the great-uncle on a full-time basis from June 2010 until April 2011. In April 2011, when the father was released from jail, the father demanded that the child be returned to the paternal grandmother’s custody.
The record indicates that both before the child lived full time with the great-aunt and the great-uncle after the entry of the June 2011 pendente lite order granting the parties alternating weeks of custody with the child the paternal grandmother allowed the parents to have unsupervised contact with the child; the record also supports a conclusion that she allowed the parents to leave her home with the child. The original February 2009 dependency judgment did not provide the parents with visitation, either supervised or unsupervised. This court recognizes, as did the juvenile court, the paternal grandmother’s desire to allow her son to see his child. However, the great-aunt and the great-uncle expressed concern about the parents’ unsupervised contact with the child given the parents’ history of drug use. Other relatives stated that they were comfortable with the parents’ seeing the child only if it was certain the parents were not using drugs. The paternal grandmother denied having allowed the child to be around the parents if they were intoxicated. However, at the close of the hearing, the juvenile court cautioned the paternal grandmother that there was a risk to the child in- having unsupervised contact with the parents and that the parties had to act to protect the child. Further, at the ore tenus hearing in this matter, the father tested positive for the use of methamphetamine. Although the father denied drug use, it was the province of the juvenile court, as the trier of fact, to determine the credibility of the witnesses. See Ex parte Fann, 810 So.2d 631, 636 (Ala.2001) (“ ‘[B]ecause the trial court has the advantage of observing the witnesses’ demeanor and has a superior opportunity to assess their credibility, this Court cannot alter the trial court’s judgment unless it is so unsupported by the evidence as to be clearly and palpably wrong.’ Ex parte D.W.W., 717 So.2d 793, 795 (Ala.1998).”).
At the close of the ore tenus hearing, the juvenile court determined that the child’s exposure to his parents, one of whom tested positive for methamphetamine at the hearing, constituted a material change in circumstances. We conclude that the evidence in the record on appeal supports the juvenile court’s finding that the great-aunt and the great-uncle had established that a material change in circumstances had occurred since the entry of the February 2009 dependency judgment. We further conclude that the totali *1040 ty of the evidence in the record on appeal supports the juvenile court’s determination that the change in custody would materially promote the child’s best interests and that the benefits of the change would offset any disruptive effect of the change in custody. Accordingly, we cannot say that the paternal grandmother has demonstrated on appeal that the juvenile court erred in modifying custody under the standard set forth in Ex parte McLendon, supra.
The paternal grandmother also argues that the juvenile court erred in failing to award her visitation with the child. In its March 27, 2012, judgment, the juvenile court awarded joint custody of'the child to the great-aunt and the great-uncle and the paternal grandmother, with primary physical custody being , awarded to the great-aunt and the great-uncle. However, the juvenile court did not afford the paternal grandmother any visitation with the child. Instead, the juvenile court ordered that the father receive alternating weekend visitation with the child and that the father’s visitation with the child “be directly supervised by” the paternal grandmother.
It appears clear to this court that the juvenile court anticipated that, in requiring the paternal grandmother to directly supervise the visitation between the child and the father, the paternal grandmother would also be afforded visitation with the child. However, should the father elect to forgo his rights of visitation, the paternal grandmother, who is a joint legal custodian of the child, would not have a method of enforcing a right to visitation with the child. Therefore, under the unique facts of this case, we reverse the judgment insofar as it fails to award the paternal grandmother visitation with the child and remand the cause for the juvenile court to enter an order affording the paternal grandmother a right of visitation with the child. We note that, in reaching its judgment on remand, the juvenile court may, but is not required to, afford the paternal grandmother visitation in addition to that of the father.
The motion filed by the great-aunt and the great-uncle seeking to dismiss the application for rehearing is denied.
APPLICATION OVERRULED; OPINION OF FEBRUARY 15, 2013, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN, J., concurs.
THOMAS and MOORE, JJ., concur in part and concur in the result in part, with writings.
DONALDSON, J., concurs in the result, without writing.

. The drug-test forms contain a list of prescribed and over-the-counter medications that each individual informed the testing facility he or she had taken in the 72 hours before the drug test, and each individual signed his or her test form. The father’s signed drug-test form indicates that he denied having taken any medications in the 72 hours before the drug test was conducted. Two handwritten notations at the bottom of that form read: "Def states that he has not taken anything” and "I did take over the counter Claritin D.”

. The great-aunt and the great-uncle’s argument on appeal that the paternal grandmother failed to preserve this argument for appeal is not persuasive.

. Even assuming that the "best interests” standard applies, any error would be harmless. See Rehfeld v. Roth, 885 So.2d 791 (Ala.Civ.App.2004) (affirming a custody modification in which the trial court erroneously applied the McLendon standard instead of the "best interests” standard, concluding that the error was harmless because the McLendon standard is more stringent than the "best interests” standard).